(No. 19869.

ENGVAL ENGESAETH, Appellee, *vs.* KARLINA ENGESAETH
*et al.* Appellants.

*Opinion filed February 21, 1930.*

BEN A. STEWART, and ELI D. LANGERT, for appellants.

BENJAMIN S. BELL, FRANCIS J. COYLE, and RUBY MIL-
LER, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

Engval Engesaeth filed a bill in the circuit court of
Rock Island county to contest the will of his father, Hans
E. Engesaeth. The issues were submitted by agreement to
the court without a jury and were decided in favor of the
complainant, and the defendants have appealed.

The issues at law directed by the court were whether
Hans E. Engesaeth was of sound mind at the time of the
execution of the writing in question, whether the writing
was the result of any undue influence, misrepresentation or
fraudulent practices of the defendants, and whether the
writing was Engesaeth's last will and testament or not.
The court found that the writing was not the result of
any undue influence, misrepresentation or fraudulent prac-
tices of the defendants, but that Engesaeth was at the time
of its execution of unsound mind and it was not his will.

The testator was a Norwegian, about sixty-one years old at the time of his death, who had lived in Rock Island for many years. During the last two or three years of his life he was employed at Augustana College. His property consisted of real estate worth $7000, which was subject to an incumbrance of $800, and personal property worth $600. He left a widow, Karlina Engesaeth, three daughters, Helen Nelson, Betsey A. Barrett and Rachel E. Engesaeth, and the complainant, his son. There was no .evidence of any mental unsoundness or incapacity until two or three days before his death. The illness which terminated in his death was of about three weeks' duration, and it was apparent that his condition was exceedingly serious for several days before his death. No question arising as to his mental ability for the transaction of business until these last few days, the evidence on that question was limited to that period of time. Except for proof of formal matters the evidence was confined to the testimony of four witnesses, Mr. and Mrs. Charles C. Detwiler for the proponents of the will, Dr. J. D. McKelvey and Dr. Willis T. Hinman for the contestants. No objections to evidence or to any proposition of law were made, and the question to be decided is purely the question of fact whether at the time of executing the will the testator was of sound mind, no cross-error having been assigned on the finding of the trial court that the will was not the result of undue influence, misrepresentation or fraudulent practices of the defendants.

The will was drawn by Mrs. Detwiler, a neighbor of the testator, and was executed between 7:00 and 7:30 o'clock in the evening of May 10, 1926. It gave all of the testator's personal and real estate and insurance to his wife and directed that she should be the sole executrix without bond and contained no other provision. It was signed by the testator by his mark, and was witnessed by Mrs. Detwiler, who drew the will, her husband, Engval M. Enge-

saeth, the contestant, by Betsey A. Barrett and Rachel E. Engesaeth, two of his three daughters, and by H. Robert Hoff. The testator died forty-eight hours later.

Mrs. Detwiler testified that she lived at 1112 Thirty-ninth street, in Rock Island, and knew the testator during his lifetime, having resided across the street from his place of residence during the last eight years of his life. During that time, and particularly for the last two or three years of his life, she saw him almost daily and talked to him probably twice a week, such conversations taking place at her house or at his house or on the street or in the yard. They were friendly neighbors. Sometimes her visits at his home would be for hours and sometimes only for a few moments. Based on the contact she had with him and her conversations with him and observations of him down to the time of his death it was her opinion that he was very capable of looking after his affairs and very intelligent up to the last, when he was stricken. He died in about three weeks from the beginning of his last illness. Prior to the time he became sick he was working. During his last illness she saw him daily. She was working at that time for the C. F. Kurtz Company and her hours were from 8:30 in the morning to 5:30 in the evening. She would visit him either before she went to work or after she came home. She was a married woman, having a family consisting of a boy of seventeen, a girl of fourteen and a little boy of ten years, all living at home. Her visits with the testator during his last illness were brief, her longest stay being probably a half hour. During those visits she would discuss his health conditions and his failings, and when his will was drawn they talked about that. They talked about his business or work. He seemed to be worried on account of the loss of his work and he was worried about his condition. The nature of his illness seemed to be just prostration and total collapse. She was requested to draw the will by Engesaeth. He first men-

tioned it the second day he was ill, and the night she found he was getting low, as he wanted her to draw it, she did so. She came around about seven o'clock in the evening on Monday, May 10, approximately three weeks after he had been stricken and about the same time after he had requested her to draw the will. She drew it up and presented it to him. She knew about the property he owned, as he often talked to her about it and how he was trying to make good on it and all. At the time she made the will he did not tell her what property he had and did not say anything with reference to his children. He had told her before that he wanted to leave everything to his wife. That was about three weeks before, and from the expressions that he gave her three weeks prior to his death she drew the will. She wrote the will in his bed-room about seven o'clock in the evening of the date the will bears, May 10, 1926. He was in bed at that time and had probably been there three weeks. He put his mark on it. She did not assist his hand in any manner. He was too weak to sign his name. She did not ask him to sign his name to the will, only to instruct him where he should sign it if he wanted to. After drawing the will she read it to him and let him see it, and he signed it. He told her he could not write his name. He just made his mark. Just before writing the will she told him she was ready to help him fix his will and asked him if he wanted her to write it. He said, "Make it to my wife." She got the form for the will from one of the little books that the banks issue and brought it over to the house that time with her because he had asked her three weeks before to help with it and she made up her mind it was time to get busy. She came over that particular night because she began to realize that the man's time was near at hand. He was growing weaker daily and that evening she felt he had not long to live. She knew that because he was unable to take nourishment. He had been growing weaker approximately three weeks and had

taken very little nourishment during all of his illness. She said that at the time he made his last will he was of sound mind and memory, and she based that on the fact that he could carry on intelligent conversations. He was capable of recognizing "us" and talked with us about his end. By "us" she said she meant anyone who called on him. He knew his neighbors and his family. While she was there the other neighbors would come in and she saw him recognize them. He called them by name while she was in the room on several occasions and called the neighbors by name the very evening that he signed the will. He called Mrs. Oberlander by name the morning before and smiled when she talked to him. He was not able to carry on long conversations, but he would answer her questions by "yes" or "no." She wrote the will in his bed-room. One of the family gave her the stationery on which the will was written and she wrote it on a table in the room. No doctor was present or called that evening during the time that the will was written. As soon as she drew up the will she returned home. She was at Engesaeth's about a half hour. He could read the English language. She handed the will to him after she had drawn it, for the purpose of having him read it. He read it with her assistance. He read mostly print, and this was script. He held the will before him and tried to read it and it appeared as though he was reading it. He usually wore glasses when he read, and he had his glasses on when he read over or attempted to read the will. They were given to him and were put on for him. After his glasses were on he scrutinized the will as though he was reading it. After he attempted to read it she read it to him, and after she got through reading it he smiled and said "thank you" to her. He said afterwards to the folks that he was glad. After he attempted to read the will and after the witness read it to him Mrs. Engesaeth held him up. He signed the will. The pen was given to him. He was told where he should sign and to sign his

name if he could. She asked him if he could sign his name and he shook his head, and she said, "Make a cross and I will sign it for you." She signed and he made the cross. On that evening prior to the drawing of the will he discussed the provisions of the will or the disposition of his property with her. He said he wanted his wife to have everything. The witness called her husband over shortly after she got to Engesaeth. She found he wanted the will and she called her husband over before she drew the will, when she knew she was going to draw it. The signature of the contestant appears as a witness to the will. Mrs. Detwiler testified that she saw him write it on the instrument and saw Engesaeth make his mark on that instrument. At the time he signed his mark, or just before, he was worried and wanted it done and showed pleasure in having it finished and after signing it he said he was glad. At that time he was of sound mind.

Charles C. Detwiler testified that he knew the testator in his lifetime, having lived across the street from him from the time the testator moved there in 1918. In the last month of his life he had probably not talked to the testator more than once. He was present at the execution of the will and saw his wife write it. The immediate family of. Engesaeth were present at the time. There was not much said before the will was signed. Engesaeth was too weak to talk and the witness did not bother him to talk to him. After the will was written it was given to Engesaeth to approve it. Whether he read it or not the witness could not say. He looked it over and handed it back to Mrs. Detwiler or Mrs. Engesaeth. He saw Engesaeth place his mark on the will. Mrs. Engesaeth held him up in bed and Mrs. Detwiler held the paper while he made the cross on it. He was too weak to write his name. When the witness came in Engesaeth addressed him by name, and that is the only thing he remembered him saying. He had often seen Engesaeth pick up the paper and read—that is,

it looked as if he was reading. He saw Engesaeth looking over the will. Whether or not he was reading it he did not know. The witness' wife called him over, saying that Engesaeth was very low. The will was not yet drawn but she started to draw it a few minutes after he got there. She was at the table writing the will and she then presented it to the witnesses to sign it. After signing it the witness went home. To the best of his knowledge Engesaeth at the time of making the will was of sound mind and sufficient memory to make a will. He seemed to be all right, so far as talking. The witness did not bother him a lot because he seemed too weak.

Dr. J. D. McKelvey testified that he is a practicing physician and surgeon, living at Moline, a graduate of Rush Medical College and had been practicing thirty-three years. He knew Hans E. Engesaeth in his lifetime and rendered medical services to him from May 6 to May 12, 1926, the time of his death. When he was first called Engesaeth was confined to his bed with typhoid fever. He called on him the first and second days and then twice a day and toward the last three times a day. On May 10 he was called twice, his last call in the evening between six and seven o'clock. The only person in the bed-room at that time that he remembered was Mrs. Engesaeth. She was always there when he called. The last three or four days he had issued orders restraining anyone from visiting the sickroom, and during the last two or three days of Engesaeth's illness he was introduced to Mrs. Detwiler, either on the porch or on the sidewalk of the Engesaeth home. During the first part of his attendance it was his opinion that Engesaeth was mentally capable of transacting his business. During the latter part he did not consider he was in a mental condition so that he could transact business. On May 10 he could only state concerning the time he was there—the different calls he made—and he did not consider Engesaeth mentally in condition to transact business. "The only con-

versation I had with the deceased on the 10th of May was in connection with the sickness and treatment. At that time Mr. Engesaeth was not able to carry on a conversation that was coherent and he was not capable at that time of reading. In my opinion, at that time Mr. Engesaeth was not capable of recognizing the natural objects of his bounty —that is, his children." He was asked, "Do you have an opinion, Doctor, as to whether or not Hans E. Engesaeth, the deceased, would be able to understand the natural consequences and results of his executing a will?" The answer was, "I think it would have to be taken into consideration, if I might explain—there is a possibility he might have had some lucid moments during that time. I was there only, possibly, three times a day the last few days. To be honest, I could not state definitely but what he might have had some lucid moments." The doctor further testified that he did not diagnose the case as typhoid fever immediately. He did not remember how many days after he was called in passed before he did so diagnose the case. At times the patient was delirious, and where there is delirium as a rule there might be that at times the severe pains would lessen and the patient might have lucid moments. The doctor did not know Engesaeth prior to his call on May 6. During the time he treated him Engesaeth talked to him only about his condition. At first his answers were responsive, at the last they were not. The doctor said, "I don't know in this case what length of time the lucid intervals lasted, because I do not know whether he had any or not, but in my experience in such cases the lucid intervals last sometimes a few minutes and sometimes probably an hour or two. It depends greatly on the condition." To the question asked him, "On the 10th of May, 1926, you stated you called at the house in the evening about seven o'clock. If the patient was such at that time that he could not apprehend business transactions, would it have been possible for him to have a lucid interval of

about an hour so that he could have transacted business?" The doctor answered, "It would be possible, yes."

Dr. Willis T. Hinman testified that he is a practicing physician and surgeon, living in Moline, of twenty-five years' practice, a graduate of the College of Physicians and Surgeons in Chicago. He attended Hans E. Engesaeth as a physician and surgeon on May 8, 9 and 11, 1926. He was a consultant with Dr. McKelvey. The patient was at his home in Rock Island at that time suffering from typhoid fever. During the time the witness visited him in the month of May his opinion was that he was not mentally capable of attending to any business. In his opinion, based on observation and examination of Engesaeth's condition, he was not capable of knowing what disposition he was making of his property on the 10th of May, 1926, being delirious, and did not have a clear perception of any matter whatever, business or otherwise, or realize what disposition he was making of his property. He did not recognize the witness on his visits. The witness was a stranger to him. In the witness' opinion he could not have lucid intervals because of his physical ailment, which was typhoid delirium. The typhoid patient, when he becomes delirious as the result of his typhoid, continues delirious until such time as his typhoid improves or until the patient dies. Engesaeth was delirious on May 8—the occasion of the witness' first visit and on his second and third calls. On his first visit he stayed in the neighborhood of one and a half hours and was given the history of the case by Dr. McKelvey. He gave the patient a physical examination and determined from his first examination that he was suffering from typhoid fever. He spent about an hour with the patient on his second visit on May 9, and the same length of time on his last visit, which was on May 11. On the first visit a line of treatment applicable to typhoid was decided upon. In this case the manifestation of delirium consisted of the crowding of the intellect and slowing of perception and

inability to grasp the purport of the questions asked and answer them intelligently. There are states of delirium, gradations, and different degrees of restlessness. It is possible for a patient having typhoid fever to be in a state or stage of delirium that would still permit of some degree of lucidity. There are degrees or stages of delirium in typhoid fever cases. In some cases there is complete mental inability to comprehend, and then there are stages of delirium where the patients are able to understand what is said and recognize people and apprehend affairs. He was not in Engesaeth's house on May 10, but he stated that in his opinion Engesaeth could not have had one or more lucid intervals on that day. His conclusion that a typhoid fever patient having arrived at a state of delirium does not have any lucid intervals was based on the pathology of typhoid fever. The condition of typhoid fever is a condition of extreme depression, not only physical but mental, and patients also have delirium. Typhoid fever is a constant infection. It starts and proceeds and runs in spite of treatment or anything that he knew how to do for it. His opinion was based on his experience with typhoid fever cases rather than on what the authorities say relative to that, and it was on his reading of the authorities that he arrived at that opinion. Dr. Hinman further testified that he understood it was the duty of a doctor under the laws of the State, when he comes in contact with a typhoid case, to notify the local authorities immediately of that fact. He never gave orders to notify the authorities to quarantine that home and did not know whether Dr. McKelvey did or whether a quarantine sign was placed on the home.

The testimony of Dr. Hinman cannot be reconciled with the facts as testified to by the Detwilers. It is not consistent with the testimony of Dr. McKelvey as to the possibility of lucid intervals. Dr. Hinman in his testimony in chief stated that in his opinion Engesaeth could not have had lucid intervals because he was suffering with delirium

caused by typhoid, and that when a patient becomes delirious as a result of his typhoid he continues delirious until his typhoid improves or until he dies, yet he stated on cross-examination that it was possible for a patient having typhoid fever to be in a state of delirium that would still permit of some degree of lucidity; that there were degrees of delirium in typhoid fever cases, and in some cases there was complete mental inability to comprehend and then there are stages of delirium where the patients are able to understand what is said and recognize people and apprehend affairs. Dr. Hinman was not at Engesaeth's house the day the will was written, May 10. Dr. McKelvey stated that at the time of the different calls he made on Engesaeth on May 10 the doctor did not consider him mentally in condition to transact business, but in regard to his ability to understand the natural consequences and results of his executing a will he would have to take into consideration the possibility that he might have some lucid moments. The doctor was there only possibly three times a day the last few days, and he said that, to be honest, he could not state definitely but that he might have had some lucid moments. The doctor could only testify as to his observations and his opinion at the times he was there and saw Engesaeth and the condition he was in at those times. He did not cover the other times, because Engesaeth might have had lucid moments. The two doctors agree, then, that Engesaeth might have had lucid moments on the 10th of May, and the other two witnesses testified that he did have lucid moments; that at the time the will was prepared and executed he recognized them and members of his family, called them by name, apparently read the will which had been prepared in accordance with his request made a few days before, when he was first taken sick. In answer to the question whether he wanted Mrs. Detwiler to write the will he said, "Make it to my wife." After he had attempted to read the will and Mrs. Detwiler had read it to him he

smiled and thanked her. He said afterward that he was glad. The testimony of Mr. and Mrs. Detwiler alone was sufficient to justify a finding of the mental capacity of the testator to make a will at the time the will was executed, and unless it was overcome by other evidence in the case required such a finding. It was not overcome by other evidence. Neither of the doctors testified that the testator was not capable of transacting the business of making his will at the time the instrument was executed. Dr. McKelvey expressly limited his expression of opinion to the time he was there—the different calls he had made; that he did not cover the other times except when he was there, because the testator might have had lucid moments, and he could not honestly state definitely that he did not have lucid moments, and he stated that on the 10th of May, when he was at the house about seven o'clock, it would have been possible for Engesaeth to have had a lucid interval of an hour or so that he could have transacted business. Dr. Hinman, also, while he stated that in his opinion Engesaeth could not have had one or more lucid intervals on May 10, stated that it was possible for a patient having typhoid fever to be in a state of some degree of lucidity; that there are stages of delirium where the patients are able to understand what is said and recognize people and apprehend affairs. Dr. Hinman's testimony was based on the proposition that there can be no lucid intervals in typhoid delirium. He, himself, however, states that there are stages of delirium in typhoid fever when the patients are able to apprehend affairs. Dr. McKelvey testified that there may be lucid intervals. The facts testified to by the other witnesses show that there were lucid intervals. The weight of the evidence is clear that the will was executed by the testator during a lucid interval, and the chancellor erred in finding otherwise.

The decree is reversed and the cause is remanded to the circuit court.          *Reversed and remanded.*